U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 JUL 15 PM 4: 23

CLERK
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

EDWARD V.,                          )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )        Case No. 2:17-cv-00209
                                    )
ANDREW SAUL,                        )
Commissioner of Social Security,    )
                                    )
        Defendant.[1]               )

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR AN ORDER
REVERSING THE COMMISSIONER'S DECISION AND DENYING THE
COMMISSIONER'S MOTION TO AFFIRM**
(Docs. 9 & 11)

Plaintiff Edward Verge is a claimant for Disability Insurance Benefits ("DIB")

under the Social Security Act ("SSA"). He brings this action pursuant to 42 U.S.C.

§ 405(g) to reverse the decision of the Social Security Commissioner that he is not

disabled. On March 26, 2018, Plaintiff filed his motion to reverse. (Doc. 9.) The

Commissioner filed her motion to affirm on May 25, 2018, at which time the court took

the pending motions under advisement. (Doc. 11.)

Plaintiff is represented by James Torrisi, Esq. The Commissioner is represented

by Special Assistant United States Attorneys David B. Myers and Jason P. Peck.

Plaintiff raises the following issues on appeal: (1) the Administrative Law Judge

("ALJ") improperly weighed the Veterans Administration's ("VA") disability rating;

(2) the ALJ improperly weighed Plaintiff's treating physician's opinion in determining

Plaintiff's Residual Function Capacity ("RFC") and failed to accord that opinion

---

[1] At the time the pleadings were filed, the Acting Commissioner of Social Security was Nancy A.
Berryhill. The case has been updated to reflect that Andrew Saul has been confirmed as
the Commissioner of Social Security as of June 17, 2019.

controlling weight; and (3) the ALJ's determination that Plaintiff's substance abuse was material to his disability was not supported by substantial evidence.

## I.    Procedural Background.

On December 12, 2013, Plaintiff filed a Title II application for DIB alleging a disability onset date of January 1, 2009. The Commissioner denied Plaintiff's application on February 27, 2014, and upon reconsideration on July 3, 2014. Plaintiff filed a timely request for a hearing on July 16, 2014.

On December 15, 2015, ALJ Matthew G. Levin held a video conference at which Plaintiff and Vocational Expert ("VE") Christine Spaulding testified. Plaintiff's alleged onset date was amended at the hearing to August 31, 2013. On May 10, 2016, after receiving new evidence from Marcus Anderson, M.D., a non-examining state psychiatrist, the ALJ held a second video conference at which VE Elizabeth C. LaFlamme, Dr. Anderson, and Plaintiff testified.

On May 24, 2016, ALJ Levin issued a written decision finding Plaintiff not disabled. Plaintiff requested review by the Social Security Administration's Office of Disability Adjudication and Review Appeals Council, which denied his request on August 24, 2017, making the ALJ's decision the final determination of the Commissioner.

## II.    Factual Background.

Plaintiff was born in 1963 and has a General Education Diploma. He joined the military at age seventeen and served until he was honorably discharged in 1983. From 1998 to 2008, he was a supervisor for underground utilities at Eustis Cable. From 2010 to 2013, Plaintiff periodically worked as a prep cook. He also performed seasonal work between 2008 and 2010 for Burke Mountain Ski Resort maintaining snow guns. Plaintiff alleges disability due to bilateral shoulder tendinopathy, degenerative disc disease of the spine, major depressive disorder, posttraumatic stress disorder ("PTSD"), polysubstance abuse disorder (alcohol and marijuana), "status-post right carpal tunnel release surgery[,]" "status-post left hand tendon transfer surgery[,]" and insomnia. (Doc. 9-1 at 1.)

2

## A. Plaintiff's Medical History.

In September 2010, VA staff psychologist Gail Isenberg, Ph.D. performed a compensation and pension examination of Plaintiff to determine whether he had PTSD. At the time, Plaintiff had participated in weekly therapy sessions with Benjamin Welch, a VA mental health counselor, for a year and was prescribed paroxetine, an antidepressant, which he ceased taking due to its side effect of nausea. While therapy had helped Plaintiff understand why he was depressed, it had not significantly addressed his symptoms. Dr. Isenberg noted that Plaintiff also suffered from tinnitus; bilateral sensorineural hearing loss; gastroesophageal reflux disease ("GERD"); tennis elbow; alcohol abuse; and cannabis dependence, which was in remission. She stated that there were no problematic effects related to his alcohol use and that he was not engaged in any other substance abuse.

In the course of the examination, Plaintiff reported difficulty leaving his home, including for activities which he previously enjoyed. Dr. Isenberg recorded that Plaintiff had a few friends whom he rarely saw and that he was in an unsuccessful romantic relationship. She noted that Plaintiff's psychosocial functioning was poor and that he was initially anxious during the evaluation but was able to relax "somewhat" as it progressed. (AR 656.) She recorded that his affect was constricted, he had intact attention and orientation to person, time, and place, and his thought process was rambling. Memory testing yielded normal results.

Plaintiff reported that he had difficulty sleeping, was often wakened by nightmares, and slept approximately five hours per day. He experienced two to three panic attacks per week, depending on his level of stress, which ranged in severity from mild to severe. Plaintiff described a severe attack as feeling as though he was having a heart attack. He noted that taking a cold shower or getting fresh air sometimes helped address his symptoms. Dr. Isenberg recorded that Plaintiff was "teary during the interview specifically when discussing his trauma event/stressors." (AR 657.) She also described him as "apt to respond to a perceived slight from others in a verbal manner" but noted he "exhibited greater impulse control since being in therapy." *Id.*

3

With regard to Plaintiff's PTSD, Dr. Isenberg opined that Plaintiff's symptoms were chronic, without remission, and ranged from mild to severe. She further found that Plaintiff reexperienced his traumatic, triggering events through images, thoughts, perceptions, dreams, and intense psychological distress when exposed to internal and external cues that "symbolize or resemble an aspect of the traumatic event" (AR 659), and experienced physiological reactivity on exposure to internal or external cues. She observed that Plaintiff reported avoiding stimuli associated with his trauma, had persistent symptoms of increased arousal, and experienced clinically significant distress or impairment in social and occupational functioning.

Dr. Isenberg opined that Plaintiff met the criteria for a diagnosis of PTSD with anxiety as well as a diagnosis of alcohol abuse and cannabis dependence. He was able to manage his own finances, he did not require the assistance of a social worker, and his current unemployment was not caused by his mental disorders. She nonetheless observed that Plaintiff's "quality of psychosocial functioning [is] directly related to symptoms of anxiety which are secondary to PTSD" (AR 661), and found Plaintiff's prognosis was "fair to good" provided he remained in individual therapy, addressed his substance abuse issues, and attained meaningful employment. *Id.* She opined that his "[p]rognosis [was] poor unless he achieve[d] sobriety[,]" *id.*, and that he did not have "total" occupational and social impairment due to his PTSD. (AR 662.)

On December 8, 2010, Plaintiff met with Scott D. Rebhun, M.D., a psychiatrist, to discuss his panic attacks after he discontinued prescribed medications to address those attacks because of the medications' side effects. Dr. Rebhun advised that alternative medications which would be most effective in treating his symptoms were addictive and therefore not appropriate for him. Plaintiff reported he drank five to six beers every few weeks, but rarely drank as many as five or six at one time, and that he regularly smoked marijuana as a coping mechanism. Dr. Rebhun opined that Plaintiff had PTSD, panic disorder, and cannabis dependence. He also opined that Plaintiff's major depressive disorder was in remission.

On June 21, 2012, the VA increased Plaintiff's disability rating from fifty percent to seventy percent based on his PTSD with anxiety, alcohol abuse, and cannabis dependence. The VA attributed the increased rating to Plaintiff's intermittent inability to perform activities of daily living, impaired impulse control, suicidal ideation, occupational and social impairment with reduced reliability and productivity, difficulty establishing and maintaining effective work and social relationships, disturbances of motivation and mood, impaired judgment, panic attacks more than once a week, anxiety, chronic sleeping impairment, depressed mood, mild memory loss, and suspiciousness. (AR 387-88.) Plaintiff was assessed a General Assessment of Functioning ("GAF") score of fifty-one, which indicates "moderate symptoms; or any moderate difficulty in social, occupational, or school functioning." (AR 388.)[2]

On August 10, 2012, Dr. Isenberg provided a medical opinion related to Plaintiff's VA disability application in which she opined that:

[i]t is difficult to determine whether or not his PTSD prevents him from working given his current use of cannabis. It may be that the Veteran's anxiety is enhanced by his abusive consumption of Marijuana. What is certain is that the combined diagnoses of PTSD and Cannabis abuse has contributed significantly in impairing the ability to acquire and maintain either physical or sedentary employment.

(AR 518.)

Plaintiff was examined by Rachel Katherine Dahl, an audiologist at the VA facility in White River Junction, Vermont, on November 28, 2012, with regard to his hearing loss and tinnitus. Plaintiff was assessed to have sensorineural hearing loss in both ears for frequencies between 500-4000 hertz and above 6000 hertz. It was also

---

[2] GAF scores are of limited relevance to a SSA disability determination. *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-5 (2000) (stating a GAF score "does not have a direct correlation to the severity requirements in [the SSA's] mental disorders listings."); *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006) ("[T]he Commissioner has declined to endorse the [GAF] score for use in the Social Security . . . disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings.") (internal quotation marks omitted).

determined that Plaintiff had service-connected tinnitus that rendered him ten percent disabled.

Effective as of August 31, 2013, the VA determined Plaintiff was "unable to function in most areas of [his] life" and was "unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities." (AR 362.) The VA therefore granted him full benefits when he appealed its initial denial of his request for an increase in his disability rating.

Three days later, Plaintiff met with Kevin Cole, M.Ed., a VA psychotherapist, who noted that Plaintiff might benefit from a medication change, was resistant to treatment for his Military Sexual Trauma ("MST"), and was in chronic pain. Mr. Cole observed that Plaintiff was irritable, guarded, had a limited range of affect, and appeared anxious and depressed. Although Plaintiff denied suicidal ideation, he endorsed frequent passive ideations of "what is the point[?]" (AR 1155-56.) Ten days later, Mr. Cole again met with Plaintiff who reported increased panic attacks with shortness of breath, sweats, and fear that he was dying, although he was conflicted about going to the hospital. Although Plaintiff previously found clonazepam helpful in managing his symptoms, at this appointment he indicated it was alprazolam he found effective. Mr. Cole recommended Plaintiff meet with his primary care physician to create a medication treatment plan and stated "[it is] clear [Plaintiff] experiences high anxiety and does not abuse medications, writer would support medication change." (AR 555.) Mr. Cole opined that Plaintiff was "chronically miserable," had a blunted and irritable mood, and was experiencing sleep disturbance. *Id.* (internal quotation marks omitted).

At an October 3, 2013 counseling appointment, Mr. Cole recorded that Plaintiff complained about tinnitus, stomach pain, chronic pain, and the poor quality of life which included no heat in his home and financial difficulties. Mr. Cole again recommended Plaintiff seek a medication change in light of his chronic anxiety and panic attacks. Mr. Cole described Plaintiff as irritable with a limited range of affect, anxious, and depressed. Although Mr. Cole found Plaintiff resistant to psychotherapeutic change, he noted that he appeared to have more physical than psychiatric complaints.

6

On October 10, 2013, Hyunsoon E. Park, M.D., a VA contract psychiatrist, evaluated Plaintiff at an outpatient mental health appointment. Plaintiff reported that he had been prescribed clonazepam to treat his PTSD and depression but had experienced no benefit from the medication and therefore ceased taking it. Dr. Park indicated Plaintiff was hesitant to try any psychotropic medications but agreed to try trazodone to treat his mood disorder and sleeplessness. Plaintiff "admitted to smoking several joints daily and drinking 6 pack[s a] couple times a week." (AR 550.) Dr. Park assessed Plaintiff to have a low to moderate risk of suicide due to his access to firearms and history of substance abuse. Dr. Park observed Plaintiff was dressed in casual attire with adequate grooming and hygiene and that he initially gave terse responses but "was more cooperative as the interview progressed." (AR 551.)

Dr. Park opined that Plaintiff's thought process and association were productive and coherent with "fairly tight associations." *Id.* Plaintiff avoided eye contact throughout the interview and exhibited a depressed and irritable mood, as well as "defensive mechanisms[,"] and minimization of his addictions. (AR 551.) Dr. Park opined that Plaintiff had a seventy percent disability rating for service-related PTSD, a depressive disorder, cannabis dependence, and alcohol abuse and assessed a GAF score of forty-five. He informed Plaintiff of "the negative consequences associated with the continued use of alcohol or cannabis while on psychotropic med[ication]s and recommended decreased use." (AR 552.) He further offered to refer Plaintiff to substance abuse treatment, which Plaintiff declined. Dr. Park also recommended psychotherapy to address Plaintiff's social isolation and cognitive behavioral therapy, which Plaintiff also declined. Finally, Dr. Park advised Plaintiff to consult with his primary care physician regarding his chronic pain.

Plaintiff was evaluated by Jeffrey Kowaleski, M.D., on October 29, 2013, at the VA hospital after Plaintiff experienced an episode of feeling like he was unable to breathe. At that time, Plaintiff reported daily marijuana smoking.

At a January 22, 2014 primary care visit, Plaintiff was examined by Alexandra Grossman, M.D., for complaints of chronic pain in his neck, stomach, arms, and shoulder

7

as well as his sciatic nerve. Plaintiff reported this pain often woke him during the night and was not addressed by ibuprofen or Tylenol. He stated that he was "miserable," and "fe[lt] angry[.]" (AR 522.) When questioned regarding his MST, Plaintiff acknowledged the attack, which occurred when he was seventeen, but did not provide details. Dr. Grossman observed that when discussing the MST Plaintiff "became tearful" and quiet but was open to considering addressing his MST in the future. *Id.* Plaintiff reported smoking marijuana several times per week and drinking one to two alcoholic beverages on a monthly basis, but stated he had never drunk six or more drinks on a single occasion in the past year. He was taking gabapentin, ketoconazole, omeprazole, and tamsulosin to address his pain, fungal infection, GERD, and enlarged prostate, respectively.

On March 11, 2014, Plaintiff visited the VA pain clinic to address his physical pain and reported as having "an extensive history of lumbar spine pain requiring surgery, bilateral shoulder pain requiring surgery and injections, bilateral wrist and arm pain, as well as hip pain." (AR 1060.) It was noted that an MRI report from October 2013 revealed bilateral moderate to severe spinal stenosis. Plaintiff displayed a depressed mood and affect at this visit. Shane M. Huch, D.O. prescribed gabapentin and recommended Plaintiff continue meloxicam and mental health treatment and take prescribed medications for his depression and mood which she opined may also offer pain relief.

The following month, on April 3, 2014, Plaintiff saw Evan S. McCord, M.D., a VA psychiatrist. At the time, Plaintiff's medical providers had discontinued amitriptyline because it was too sedating, and he had been prescribed hydroxyzine (which he had not yet taken) to address his sleep issues and diazepam for his anxiety. Dr. McCord opined that Plaintiff had chronic, unremitting PTSD symptoms and was struggling to fall and stay asleep. Plaintiff reported frequent nightmares, irritability, struggles with interactions with others, and chronic suicidal ideation without intent or plan. Plaintiff reported he had not drunk any alcohol in the past month but acknowledged intermittent binge drinking in the past, including occasionally drinking a bottle of whiskey in a single night. Plaintiff also acknowledged smoking tobacco and marijuana daily, although he had recently

reduced the amount of marijuana. Plaintiff rated both his anxiety and depression as between a seven and eight out of ten.

At a May 9, 2014 appointment with Dr. McCord, Plaintiff reported significant depression and anxiety, irritability, unwanted recollections of past events, feelings of detachment, frustration with physical symptoms, and increasing isolative tendencies. Dr. McCord noted that Plaintiff had attempted suicide in 1982 following his MST. He observed that Plaintiff made poor eye contact, had a blunted affect, appeared depressed, and needed to be redirected from a tangential thought process although he was generally cooperative. Plaintiff's judgment and insight were rated poor to fair; his attention was fair. Dr. McCord opined that Plaintiff was suffering from PTSD; chronic, moderate cannabis use disorder; and alcohol use disorder which was in partial remission. He recommended that Plaintiff continue with diazepam and try hydroxyzine for his sleeplessness. Plaintiff was cautioned against using alprazolam to treat his anxiety as it had not been prescribed.

In connection with Plaintiff's application for VA disability benefits, Mr. Cole provided a medical opinion dated July 23, 2014 to the Board of Veterans Appeals. Mr. Cole indicated that he had worked with Plaintiff from March 2010 to January 2014 and "ha[d] come to realize the prognosis for significant improvement [was] poor." (AR 1269.) Mr. Cole further noted that Plaintiff had been diagnosed with PTSD which resulted in a seventy percent service-related disability rating, major depression, anxiety, and acute stress. He opined that:

[Plaintiff] is totally and permanently disabled due to PTSD and [MST]. He is completely disabled emotionally, occupationally, and socially. He is extremely avoidant, angry, isolative and mistrusting. He has developed somatic problems resulting in chronic severe pain. Although [Plaintiff] is currently working with another psychotherapist it is the opinion of this writer that [Plaintiff] is unemployable and totally disabled by his Service Connected condition of PTSD.

(AR 1268.)

In August 2014, Plaintiff was admitted to the VA hospital's psychiatric unit after making "concerning suicidal statements." (AR 929.) While hospitalized, he reported he

9

found prescribed medications and group therapy helpful, although he continued to have nightmares. Plaintiff requested Xanax to address his anxiety, sleep disturbances, and nightmares. He informed the medical team that marijuana addressed his nausea, anxiety, attitude, sleep disturbances, and nightmares. Psychiatrist Paul Holztheimer opined that Plaintiff had a history of MST-related PTSD, chronic pain, and severe depression. During his stay, Plaintiff played cribbage with another veteran, worked on a puzzle, watched television, and did his own laundry. He was discharged on August 29, 2014.

In the month following Plaintiff's hospitalization, the VA denied Plaintiff's request for an increased disability rating for his PTSD-related headaches on the grounds that they were not frequent enough and because an evaluation of one hundred percent disability "is not warranted unless the evidence shows total occupational and social impairment" and "[s]ince there is a likelihood of improvement, the assigned evaluation is not considered permanent and is subject to a future review examination." (AR 369.) After an appeal of the September 2014 decision, the VA issued a new disability rating decision, finding Plaintiff was entitled to individual unemployability because he was "unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities" as of August 31, 2013. (AR 362.) Plaintiff was found to be seventy percent disabled based on his PTSD. The decision letter stated the "examiner indicates that your prognosis is unclear at this time. However, with treatment bumped to a higher level, with abstinence from marijuana and with reevaluation of medications, you may be able to get to a higher level of functioning." *Id.* It also stated: "[Plaintiff's] current functioning is worse tha[n] it was in [his] most recent VA examination. [He is] unable to work and to function in most areas of [his] life. Therefore, the grant of individual unemployability is granted but not considered permanent." *Id.*

On November 12, 2015, Plaintiff had his first mental health counseling appointment with Dr. William Burch, M.D., Ph.D., a VA staff psychiatrist, to whom he reported problems initiating and maintaining sleep and was "rather persistent on wanting [V]alium for his insomnia." (AR 1529.) He also reported that he did not drink alcohol, could not recall when he last had alcohol, denied any issues with alcohol in the past, and

stated he used marijuana daily. Plaintiff described significant trauma from MST and being molested as a child. He indicated he experienced frequent panic attacks, nightmares, flashbacks, hypervigilance, and social isolation. Dr. Burch noted it was unclear "how reliable a historian [Plaintiff] is" and "[Plaintiff] did not appear to me to be forthright about his history of alcohol problems" as records suggested alcohol dependency. (AR 1530-31.) Dr. Burch opined that Plaintiff appeared to have PTSD but did not appear depressed, manic, or psychotic.

On March 23, 2016, Plaintiff was evaluated by Brian Shiner, M.D., a VA staff psychiatrist, who was providing coverage for Dr. Burch. Plaintiff reported symptoms of stress, tinnitus, and lack of sleep. Dr. Shiner was unable to build a rapport with Plaintiff as he conducted several mental health assessments. Dr. Shiner found that Plaintiff did well on a cognitive assessment but "[o]n his PTSD assessment, he met all symptom clusters and scored especially highly on avoidance and numbing items." (AR 1680.) Plaintiff had apparent psychomotor retardation, reported depressed mood and sleep difficulties, and exhibited a closed posture; a monotone, colorless, low-volume voice; a blunted thought process; and difficulty providing specific details. Dr. Shiner recorded that Dr. Burch had prescribed gabapentin and Ambien which Plaintiff reported taking inconsistently. Dr. Shiner observed that Plaintiff's most severe PTSD symptoms overlapped with his depression and were moderate to severe.

Seven days later, Plaintiff met with Dr. Burch and reported that he was not taking his prescribed medications and that he was feeling stressed because his brother had asked him to move out. He further reported that he was experiencing chronic suicidal ideations without a plan. He denied alcohol and drug use and acknowledged that gabapentin had been helpful for his pain in the past and he was unsure why he ceased taking it. Dr. Burch recorded that Plaintiff had "excellent eye contact" but was difficult to engage and provided terse answers to his questions. (AR 1671.)

On April 29, 2016, Dr. Burch provided a medical opinion in connection with Plaintiff's DIB application in which he recounted that he had treated Plaintiff for PTSD, panic disorder, alcohol use disorder, and cannabis use disorder since November 12, 2015

11

and that the "significant nature of [Plaintiff's] mental illness precludes his ability to work or maintain employment." (AR 1781.) Dr. Burch opined that Plaintiff's anxiety-related disorders were so severe that the social security listing criteria were met. He further opined that:

> [Plaintiff's] sobriety from cannabis would have little impact on his ability to work. He has reported to me periods of time when he has not used cannabis and yet still reported significant PTSD symptoms and mental health issues which would likely make it impossible for him to work and hold a job. I am writing this letter in support of the determination that he is permanently and totally disabled.

*Id.*

Dr. Burch based this opinion on "medically documented findings" of "generalized persistent anxiety" accompanied by motor tension, autonomic hyperactivity, apprehensive expectation, increased vigilance, and scanning. (AR 1782.) He also observed that Plaintiff had persistent irrational fear, recurrent severe panic attacks, and recurrent obsessions and compulsions which resulted in marked distress. As a result, he opined that Plaintiff was extremely limited in activities of daily living; maintaining social functioning; concentration, persistence, or pace; and had prior episodes of decompensation. Dr. Burch noted Plaintiff's symptoms had started in 1982 and worsened over the years so that he had "not [been] able to function very well for 5-6 years now" despite attending regular therapy sessions. (AR 1783.)

On the disability questionnaire, Dr. Burch stated Plaintiff would need "extreme" occupational adjustments to: (1) respond appropriately to usual work situations; (2) respond appropriately to supervision; (3) respond appropriately to co-workers; (4) deal with the public; (5) maintain attention or concentration; (6) respond appropriately to changes in routine work settings; and (7) deal with work stress. (AR 1784.) Dr. Burch also stated Plaintiff would need "marked" occupational adjustments to function independently. *Id.* Dr. Burch noted Plaintiff "has frequent panic attacks and extremely poor ability to cope with stress" and would miss four or more workdays per month due to his mental impairments. When asked about a less than forty hour workweek, he indicated

that Plaintiff could not "hold a job at all." (AR 1784-85.) Acknowledging Plaintiff's historical issues with alcohol abuse, Dr. Burke noted that Plaintiff reported he had refrained from marijuana use for four months.

## B. State Consulting Physicians' Opinions.

On February 12, 2014, Ellen Atkins, Ph.D., a non-examining state consulting psychiatrist, opined that Plaintiff would experience mild restrictions in his activities of daily living and moderate difficulties in maintaining social functioning and concentration, persistence, or pace. She opined that Plaintiff was not significantly limited in his ability to carry out very short and simple instructions, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, or make simple work-related decisions. She concluded Plaintiff was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. Finding that Plaintiff was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and could not perform at a consistent pace without an unreasonable number and length of rest periods, she also imposed limitations for "crowded work spaces and high production [] tasks/settings." (AR 114.) Dr. Atkins opined that Plaintiff's "[e]pisodic exacerbations in anxiety [and] depression c[ould] temporarily undermine [his] cognitive efficiency. Otherwise, from a psych[ological] perspective, with social limitations, [Plaintiff] can sustain [concentration, persistence, and pace] over two hours over [a] typical work day/week for simple 1-3 step tasks." *Id.* She noted Plaintiff would do best performing tasks which involved limited or no social interaction.

On February 27, 2014, Geoffrey Knisely, M.D., an examining state consulting physician, offered an opinion in connection with Plaintiff's DIB application wherein he noted that Plaintiff "[r]ambled quite a bit, spoke fast, [and] seemed nervous." (AR 108.) During the examination, Plaintiff reported that he had difficulties with memory, concentration, getting along with others, oral instructions, stress, and changes in routine.

13

Noting that Plaintiff had a history of military service, during which he experienced MST and witnessed others' accidents and deaths, Dr. Knisely found that Plaintiff had received VA counseling since at least 2009 with no inpatient psychiatric hospitalizations and had been prescribed medications which he did not take due to their negative side effects. He further noted Plaintiff's "current level of functioning is exacerbated by his physical conditions[,]" and found that "other than [Plaintiff's] anxious, depressed or irritable mood . . . [o]verall, from a purely psych[ological] perspective, [Plaintiff] retains significant residual capacities." (AR 109.) Dr. Knisely diagnosed Plaintiff with the following severe impairments: disorders of the back (discogenic and degenerative); peripheral neuropathy; dysfunction of major joints; anxiety disorders; affective disorders; and substance addiction disorders. In response to a question about the credibility of Plaintiff's statements regarding his symptoms, considering the medical and non-medical evidence in the record, Dr. Knisely found Plaintiff partially credible noting that the "[a]lleged physical and psych limitations are out of proportion to that which the objective medical evidence supports." (AR 111.) Dr. Knisely opined that Plaintiff was not disabled pursuant to SSA standards. In an opinion provided five months later, Carl Runge, M.D., a non-examining state consultant, reached the same conclusions as Dr. Knisely.

On July 3, 2014, Roy Shapiro, Ph.D., provided a non-examining state consultant opinion and agreed with the assessment made by Dr. Atkins. Dr. Shapiro opined that Plaintiff was restricted from working in crowded work spaces and for high-production tasks and concluded that Plaintiff could "manage brief routine interactions with [the] general public, coworker[s] and supervisors, but w[ould] do best in tasks/settings that involve[d] limited or no social interaction." (AR 130.)

## C. Plaintiff's Function Reports.

In a January 20, 2014 function report, Plaintiff reported that his PTSD made it difficult to interact with other people while his physical injuries limited his ability to work because his chronic pain was debilitating. He stated that he lived alone and spent his day doing housework, caring for his pets, and watching television. He reported he

14

ventured outside every day, sometimes for short walks, and was able to drive alone. He shopped for food and gas once a month for approximately an hour.

Plaintiff reported that nightmares, flashbacks, panic attacks, and anxiety impeded his ability to sleep. He wore hearing aids and glasses on a daily basis. He was taking trazadone, which made him feel "overly sedated[.]" (AR 306.)

Plaintiff indicated he had no problems with his personal care, although friends and family frequently told him he needed a haircut or shave. He set alarms in order to remember when to take his medications and could only prepare simple meals for himself. Because of his conditions, he did not cook often and only ate once a day. He also needed to be reminded of doctor and VA appointments. Plaintiff reported that, although he cleaned his house and did laundry once a week and was able to wash his dishes every day, his family and friends nonetheless told him that his house needed to be cleaned. Plaintiff stated he was able to pay bills, count change, handle a savings account, and use a checkbook.

With regard to his hobbies and interests, Plaintiff enjoyed fishing, hunting, diving, camping, and watching television. He indicated he used to be able to participate in these hobbies but "hardly d[id] anything anymore." (AR 303.) He did not like being around other people, did not spend time with others, and did not go anywhere on a regular basis. He stated he could walk for short distances but then would need to take breaks due to pain. He was unsure of how long he could maintain attention or follow written instructions, and he was unable to finish what he started. He also reported that he did not get along well with authority figures, did not handle stress well, and could not manage changes in his routine.

On June 8, 2014, Plaintiff completed a second function report stating he was unable to be around other people because of his PTSD and MST, could only stand for a short period of time, and was unable to bend over or kneel without pain. He reported hearing loss, tinnitus, and daily panic attacks and anxiety and stated his daily activities consisted of "try[ing] to maintain sanity," watching television, and staying at home. (AR

15

321.) He no longer reported caring for pets and indicated that before his alleged disabilities, he was able to scuba dive, hike, ride bikes, socialize, fish, and hunt.

Plaintiff reported difficultly putting on his pants, socks, and shoes, and washing his lower extremities due to trouble bending over. He stated he needed to be reminded to eat, shave, and get his hair cut. His friends also called to remind him to take his medications. Plaintiff stated he did not eat every day and sometimes had to be reminded to eat. He indicated he knew how to cook but did not do so often and primarily ate sandwiches, canned foods, and whatever he was able to obtain from the local food shelf. He was able to wash his dishes and clothing but paid his niece to clean his house. He stated he did not do housework or yard work because he was not motivated and because these activities were painful. He was able to drive a car and go out alone. He went to stores to purchase basic necessities when he could afford to, and each trip only took him a few minutes. With regard to interacting with others, he stated that no one liked his attitude, he did not trust anyone, and that people did not like him.

### D. Testimony at the December 15, 2015 ALJ Hearing.

At the ALJ's December 15, 2015 hearing, Plaintiff testified that when he worked as a cook he requested to work in an isolated area because he experienced panic attacks when he had to interact with people. He explained that when he experienced a panic attack, he would feel hot and sick and needed to put a cold towel on his head. He testified he had missed approximately forty-five days of work due to panic attacks and ceased working after his panic attacks increased to the point where it felt as if he had an "extreme sunburn" or that someone was throwing hot liquid or acid on him. (AR 81.) He also testified that his supervisor was concerned when he lost his temper with a young co-worker during a panic attack.

Plaintiff reported that he was living at a hunting camp in the woods with no electricity or running water and was still experiencing panic attacks several times a day. He indicated that the camp was not winterized and that he needed to find a new place to live but was too afraid of fire to live in an apartment building or in town.

16

Testifying that he first smoked marijuana toward the end of his military service after he "had a lot of bad, bad things happen" (AR 82), Plaintiff claimed that marijuana improved his physical symptoms of retching and dry heaving and improved his state of mind. He had tried prescribed medications without success. In the twenty-seven months preceding the hearing, he had occasionally abstained from marijuana, citing seven months as his longest period of abstinence. He stated his symptoms were worse without marijuana because he woke up more often at night and experienced more extreme panic attacks, which included being unable to breathe. In response to a question from his attorney about his medications, Plaintiff testified he was not taking any prescribed medications for his PTSD and panic attacks because "the cure was worse than the problem[.]" (AR 83.) He noted that while he was on medications, his symptoms were so severe he had to receive inpatient treatment at the VA's mental health facility.

With regard to his impairments, Plaintiff stated he had a fusion in his back in the late 1990s and still experienced extreme pain extending from the middle of his back down to his hips and legs which was exacerbated by sitting. In the early 2000s, he underwent a second spinal surgery, but it did not alleviate his symptoms. Plaintiff noted that he had difficulty sleeping and was "lucky" to get two hours of uninterrupted sleep. (AR 85.) Plaintiff had left shoulder surgery to address his tendinopathy and had a gunshot wound in his left arm from a hunting accident. After multiple surgeries, he could not fully extend the fingers on his left hand. The tendon transfer surgery which was performed on his left hand returned enough functionality to hold a steering wheel.

Plaintiff testified that he was able to comfortably carry a gallon of milk or a small bag of groceries but nothing heavier. He stated that if he pushed himself he could stand for approximately forty-five minutes but then would need to sit down. He indicated he spends most of the day lying down due to pain and that it is difficult for him to bend over. Plaintiff also testified that he has tinnitus and hearing loss for which he wears hearing aids. The tinnitus made it difficult for him to fall asleep and he found it "distracting and irritating." (AR 90.)

Plaintiff received counseling services through the VA in the past but testified that he had not been engaged in treatment consistently for the year prior to the hearing because he was living at the hunting camp. He stated that he did not want to be around other people and the hundred-mile drive to the VA was difficult because he needed someone to drive him because a panic attack would render him unable to drive. He noted that there was another veteran he could tolerate who drove him to the VA.

When Plaintiff lived with his girlfriend, she performed all of their errands because he refused to go out in public. Approximately three months prior to the hearing, Plaintiff "shutdown" and was unable to make eye contact or speak to his girlfriend which prompted the end of their relationship. He testified that he got up one morning, left their house in a bathrobe, and drove away, leaving behind all of his possessions. He reported feeling alienated around other people and if he is around too many people he experiences a panic attack which takes hours to resolve. He also testified that he has "extreme nightmares" which result in him waking up during the night shaking as well as flashbacks to the nightmares for the remainder of the week. (AR 93.) When he has a panic attack, he reported taking a cold shower or calling an ambulance.

At the time of the hearing, Plaintiff testified that he had been prescribed some new medications to address issues with his stomach, prostate, sleep, back, cholesterol, and arthritis. When asked about side effects, Plaintiff responded that his prior medications made him feel ill and agitated around other people whereas his new medications made him feel exhausted and drained. He had not been taking medications to address his mental health issues for approximately one year because of their negative side effects.

The ALJ asked about alcohol use, and Plaintiff responded that he drank very little and considered himself a social drinker, sometimes having a drink or two with his brother. He testified that he did not have a problem abstaining from alcohol but acknowledged that his medical records evidenced a history of binge drinking.

In response to the ALJ's questions, VE Spaulding testified that Plaintiff's prior work experience satisfied the definitions of a cook's helper, a lineman, and a line supervisor as defined in the Department of Labor's Dictionary of Occupational Titles.

The ALJ then asked VE Spaulding about two hypothetical individuals who had a similar age, education, and vocational background as Plaintiff. The first individual was limited to light work; was allowed to change positions for approximately five minutes per hour; was able to frequently climb stairs; and was able to occasionally climb ladders, ropes, and scaffolds, stoop and crawl, and perform overhead reaching bilaterally. The first individual was also limited to unskilled work, with no loud background noise, and could maintain attention and concentration for two-hour increments throughout an eight-hour workday and forty-hour workweek. The first individual could also sustain brief, routine social interaction with the general public, co-workers, and supervisors. VE Spaulding opined that, given those limitations, the hypothetical individual could perform the positions of cashier, collator operator, or price marker, all of which existed in significant numbers within the national economy. The second hypothetical individual had the same limitations as the first but would also be off task approximately fifteen to twenty percent of the workday and would be unable to sustain brief, superficial social interaction with co-workers, supervisors, or the general public. VE Spaulding opined that the second hypothetical individual would not be able to perform any work in the national economy.

**E.     Testimony at the May 10, 2016 ALJ Hearing.**

After the initial ALJ hearing, ALJ Levin propounded interrogatories to a medical expert and Plaintiff's attorney requested a supplemental hearing. At the May 10, 2016 supplemental hearing, Plaintiff, Marcus Anderson, M.D., and VE LaFlamme testified. Plaintiff's attorney informed the ALJ that Plaintiff's VA disability rating had been increased to one hundred percent because of his unemployability.

In response to his attorney's questions, Plaintiff reported that in the three years before the hearing he had abstained from marijuana for various periods of time including a six-month period. He testified that he smoked marijuana to address his panic attacks which included nausea, dry heaving, and shaking. Since the December 15, 2015 hearing, he had smoked marijuana once because he experienced a severe panic attack and felt his only options were to smoke marijuana or go to the hospital. With regard to his alcohol use, Plaintiff testified that he had drunk two or three alcoholic beverages in the last six

19

months. He indicated that his panic attacks and anxiety had remained consistent over the last several years.

Following Plaintiff's testimony, the ALJ questioned Dr. Anderson regarding Plaintiff's alleged disabilities. Dr. Anderson opined that Plaintiff had the medically determinable impairments of PTSD, major depressive disorder, alcohol use disorder, and cannabis use disorder and that none of these disorders met any of the relevant Listings. With regard to Plaintiff's ability to maintain concentration, persistence, and pace, Dr. Anderson opined that Plaintiff's subjective complaints were severe but that the objective testing did not support a marked limitation in functioning. In answer to an interrogatory, however, Dr. Anderson acknowledged that Plaintiff displayed chronic poor concentration and motivation as well as questionable decision making in social situations. He anticipated "perhaps a gradual worsening over the course of years" of Plaintiff's symptoms. (AR 63.) Dr. Anderson opined that Plaintiff had a marked limitation in social functioning but attributed that limitation, "at least in part if not significantly[,]" to Plaintiff's use of marijuana, although he acknowledged Plaintiff had become more isolated. (AR 44.) He opined that provided Plaintiff was permitted to work independently he would be able to maintain the level of persistence and pace necessary to understand simple one to three-step instructions and complete basic tasks.

Because there were no records to support Plaintiff's claim to periods of abstinence from substances, Dr. Anderson could not draw any conclusions regarding Plaintiff's limitations of social functioning when sober. According to the Diagnostic and Statistical Manual of Mental Disorders, full remission is a twelve-month period with no use of substances. Dr. Anderson also noted that according to medical records from January 7, 2016, Plaintiff reported marijuana and alcohol use which contradicted his testimony at the hearing and opined that, based on Plaintiff's ability to interact with his mental health and medical providers, even while using substances, he would be able to sustain similar interactions in a work setting.

In response to questions from Plaintiff's counsel, Dr. Anderson opined that use of marijuana may alleviate the hypervigilance and hyperarousal symptoms of PTSD but can

exacerbate negative cognitive distortions and mood alteration, including intentionally avoiding contact with others. With regard to Plaintiff's panic attacks, Dr. Anderson acknowledged that "[t]here is some evidence that medical marijuana when prescribed by a physician in a controlled setting is helpful for those types of anxiety disorders . . . [but] when it's not in a controlled environment and being prescribed by a medical doctor, you really don't know what level of cannabis they're getting." (AR 49.) Dr. Anderson further opined that "someone who is using cannabis off the street on an intermittent non-controlled way may or may not see that benefit, even in the panic, anxiety or hypervigilance symptoms." *Id.*

With regard to Plaintiff's panic attacks, Dr. Anderson noted that Plaintiff had not been diagnosed with a panic disorder but that his flashbacks and hyperarousal were likely subsumed within a PTSD diagnosis. In response to a question about how these episodes would affect Plaintiff's ability to sustain concentration, persistence, and pace, Dr. Anderson cited Plaintiff's ability to complete mental status exams and Dr. Burch's notes that Plaintiff's thinking was linear, logical, and well-oriented as support for a conclusion that Plaintiff's limitations were not severe. Dr. Anderson acknowledged Dr. Burch's opinion that Plaintiff would be off task more than twenty percent of the workday but disagreed because it was not supported by the record because it was attributable to Dr. Burch's bias in favor of his patient. Dr. Anderson reiterated that "in [his] medical opinion, unless someone has actually had a prolonged period of absolute abstinence [from marijuana], preferentially with the combination of some sort of substance abuse treatment, it's difficult to say that it's not a factor" (AR 61) and that Plaintiff's level of functioning and presentation were stable.

Following Dr. Anderson's testimony, the ALJ presented VE LaFlamme with four hypothetical individuals of similar ages, education, and vocational backgrounds as Plaintiff. The first hypothetical individual was limited to light work; needed to change positions approximately five minutes per hour; could frequently climb stairs; could occasionally climb ladders, ropes, and scaffolds; stoop, crawl, and reach overhead; and was unlimited for balancing, kneeling, crouching. The individual was limited to simple,

21

unskilled work, one to three-step tasks, and could maintain attention and concentration for two-hour increments throughout an eight-hour workday and forty-hour workweek, should avoid social interaction with the general public, and could sustain brief and superficial social interaction with coworkers and supervisors. VE LaFlamme opined that, with those limitations, the first hypothetical individual could perform the positions of price marker, laundry classifier, and mailroom clerk, all of which existed in significant numbers within the national economy.

The second hypothetical individual had the same limitations as the first but would also be off task twenty percent of the workday. VE LaFlamme opined that the second hypothetical individual would not be able to sustain any work. The ALJ then asked VE LaFlamme to consider a third hypothetical individual who had the same limitations as the first but would be absent from work four times per month. She responded that such a limitation would preclude work. The ALJ presented a fourth hypothetical individual who had the same limitations as the first except he would be unable to sustain "even brief and superficial social interaction." (AR 69.) VE LaFlamme opined that this limitation would also preclude any work.

## III. Application of the Five-Step, Sequential Framework.

An ALJ must follow a five-step, sequential framework to determine whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant has a severe impairment or combination of
> impairments; (3) whether the impairment meets or equals the severity of the
> specified impairments in the Listing of Impairments; (4) based on a
> "residual functional capacity" assessment, whether the claimant can
> perform any of his or her past relevant work despite the impairment; and
> (5) whether there are significant numbers of jobs in the national economy
> that the claimant can perform given the claimant's residual functional
> capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R.

§§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)). "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden

22

of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citation and internal quotation marks omitted). At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

At Step One, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. At Step Two, the ALJ found Plaintiff had the following severe impairments: bilateral shoulder tendiopathy, degenerative disc disease of the spine, major depressive disorder, PTSD, and polysubstance abuse disorder (alcohol and marijuana). The ALJ concluded that Plaintiff's tinnitus, right carpal tunnel release, left hand ulnar nerve palsy, sleep apnea, and insomnia were not severe impairments.

At Step Three, the ALJ determined that none of Plaintiff's severe impairments, either in isolation or combination, met or medically equaled a listed impairment at 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ evaluated Plaintiff's back pain in the context of Listing 1.04, which addresses spinal impairment. Because Plaintiff failed to establish evidence of nerve root compression, the ALJ concluded that this Listing was not satisfied. The ALJ also evaluated Plaintiff's shoulder tendiopathy in the context of Listing 1.02, which addresses major dysfunction of joints in the upper extremities. The ALJ found this listing was not satisfied because Plaintiff failed to prove he was unable to perform fine and gross movements effectively.

With regard to mental health issues, the ALJ considered Plaintiff's mental impairments and substance use disorders in the context of Listings 12.04, 12.06, and 12.10. The ALJ concluded that Plaintiff did not satisfy the "paragraph B" criteria because he did not have at least two of the following: "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." (AR 16.) In so ruling, the ALJ acknowledged that Plaintiff had marked difficulties in social functioning and a nine-day psychiatric hospitalization in

23

August 2014 but did not consider this episode extended because, among other things, "during much of the period at issue, he has interacted with a girlfriend" and because Plaintiff "engaged in activities such as playing cribbage and doing laundry." (AR 17.)

At Step Four, the ALJ found that Plaintiff, based on all of his impairments, including the substance use disorders:

> has the [RFC] to perform light work as defined in 20 C.F.R. 404.1567(b) except that he requires the opportunity to alternate postures five minutes of every hour. He can frequently climb stairs and occasionally climb ladders. He has no limitations on balancing or crouching, but he can only occasionally stoop and crawl. He is limited to occasional overhead reaching with the upper extremities. He is limited to simple, unskilled work, but he is able to maintain attention and concentration for 2-hour increments throughout an 8-hour workday. He should avoid all social interactions with the general public and he would be unable to sustain even brief and superficial social interaction with co-workers or supervisors.

*Id.*

At Step Five, the ALJ found that Plaintiff could not perform past relevant work and, "considering [Plaintiff's] age, education, work experience, and [RFC] based on all of the impairments, including the substance use disorders" (AR 18), there were no jobs which exist in significant numbers in the national economy Plaintiff could perform and thus a finding of "disabled" was appropriate.

When there is medical evidence of an applicant's drug or alcohol use, the "disability" inquiry does not end with the five-step analysis. 20 C.F.R. § 416.935(a). ALJ Levin therefore continued his analysis and concluded that "in the absence of polysubstance abuse, the record does establish that [Plaintiff] would continue to have a 'severe' impairment or combination of impairments within the meaning of the [SSA]." (AR 19.) He found that without substance use, Plaintiff would have the same RFC, except that he could "sustain occasional brief and superficial social interaction with co-workers or supervisors." (AR 21.) In making this determination, he considered Plaintiff's testimony that "his panic attacks and anxiety continue to be just as bad as in the past. He feels that marijuana helps this problem. He asserted that he has had only 2-3 drinks in the past 6 months. He admitted to using marijuana just prior to the date of his

recent hearing." *Id.* The ALJ noted that "in February 2014, [Plaintiff] admitted to Dr. McCord that he used marijuana on a daily basis and [that he] also engaged in binge drinking[.] However, in the same month, he reported to consultative physician Dr. Rossman that he drank only 1-2 beers per month" and "[t]his evidence casts doubt on the [Plaintiff's] veracity in this case." *Id.*

In reaching his determination, ALJ Levin afforded great weight to the testimony of Dr. Anderson as a specialist in the area of mental disease. He considered the opinion of Dr. Burch, but afforded it little weight because that opinion was allegedly inconsistent with the substantial evidence of record, not supported by objective testing, and based on Plaintiff's unreliable self-report.

The ALJ also considered the evidence that Plaintiff had been awarded a seventy percent service-connected disability rating from the VA which was raised to one hundred percent in January 2015, but afforded it little weight because any determination of disability is reserved to the Commissioner and because the ALJ suggested "the examiner felt abstinence from marijuana would improve functioning and he did not expect ongoing disability[.]"[3] (AR 23.) ALJ Levin afforded great weight to the opinions of Drs. Rossman, Runge, and Shapiro.

At Step Five, ALJ Levin determined that if Plaintiff ceased his substance use, he would still be unable to perform past relevant work but could perform the positions of price marker, laundry classifier, and mailroom clerk, all of which existed in significant numbers within the national economy. He therefore concluded that Plaintiff was not disabled.

---

[3] The VA Examiner stated: "It is unclear what the [Plaintiff's] prognosis is at this time . . . . However, with treatment bumped to a higher level, with abstinence from marijuana and with reevaluation of his medication, the [Plaintiff] may be able to get to a higher level of functioning." (AR 1283.)

## IV.   Conclusions of Law and Analysis.

### A.   Standard of Review.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (internal quotation marks omitted)). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre*, 758 F.3d at 149. "It is the function of the Secretary, not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal quotation marks omitted) (alteration in original).

### B.   Whether the ALJ Improperly Weighed the VA's Disability Rating.

Plaintiff contends that the ALJ erred by assigning the VA disability rating little weight and that he was required to give the VA determination "some" weight. (Doc. 9 at 3.)

Under the social security regulations applicable to Plaintiff's DIB application:

A decision by any nongovernmental agency or any other governmental
agency about whether you are disabled or blind is based on its rules and is
not our decision about whether you are disabled or blind. We must make a
disability or blindness determination based on social security law.
Therefore, a determination made by another agency that you are disabled or
blind is not binding on us.

20 C.F.R. § 404.1504. The Second Circuit has held that "while the determination of another governmental agency that a social security disability benefits claimant is disabled is not binding on the [Commissioner], it is entitled to some weight and should be considered." *Hankerson v. Harris*, 636 F.2d 893, 896-97 (2d Cir. 1980) (citation

omitted); *see Stokes v. Astrue*, 2012 WL 695856, at *15 (N.D.N.Y. Mar. 1, 2012) ("[T]he ALJ was obligated to, at the very least, consider the [VA's] determination as it was based upon the same medical record.").

ALJ Levin cited the VA's seventy percent service-connected disability rating in his decision and acknowledged that it had been raised to a one hundred percent in January 2015. The ALJ noted that the VA examiner who issued the rating stated that "with abstinence from marijuana and with reevaluation of medications, [Plaintiff] may be able to get to a higher level of functioning" and that "the grant of individual unemployability is granted but not considered permanent." (AR 362.) ALJ Levin likewise determined that Plaintiff was disabled, but would not be disabled if he abstained from substance abuse. Because the ALJ considered the VA's disability rating in making a disability determination and explained why he felt it was not persuasive, there is no reversible error in his decision to accord it little weight.

## C.    **Whether the ALJ Improperly Weighed Dr. Burch's Opinion.**

Plaintiff asserts that ALJ Levin failed to assign controlling weight to Dr. Burch's opinions, did not provide good reasons for failing to do so, and improperly ascribed a bias to Dr. Burch unsupported by the record.

A treating physician's opinion on the nature and severity of a claimant's condition is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Schisler v. Sullivan*, 3 F.3d 563, 567-69 (2d Cir. 1993) (explaining the SSA regulations give "controlling weight" to a treating physician's opinion "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence") (internal quotation marks omitted).

Even when a treating physician's opinion is not given controlling weight, the opinion is generally entitled to some weight because a treating physician is "likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical

evidence[.]" 20 C.F.R. § 404.1527(c)(2). When the ALJ decides to afford less than controlling weight to a treating physician's opinion, the ALJ must provide good reasons for failing to do so and must consider specific factors in that determination. *See Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (noting the ALJ must "give good reasons" for the weight afforded to the treating source's opinion) (internal quotation marks omitted); *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019) ("An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error.").

> The factors that must be considered when the treating physician's opinion is not given controlling weight include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist.

*Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (internal quotation marks omitted); *see also* 20 C.F.R. § 404.1527(c) (listing factors).

In this case, the ALJ assigned Dr. Burch's opinion little weight because it was allegedly not supported by his own clinical observations as he had only been treating Plaintiff since 2015 and acknowledged Plaintiff did not appear "forthright" with regard to his substance abuse and did not appear depressed.[4] (AR 22.)

The ALJ's analysis of Dr. Burch's opinions was generally conclusory in manner and unsupported by examples or citations to the record. It also failed to analyze the opinion in accordance with the factors set forth in 20 C.F.R. § 404.1527(c)(2). Although "slavish recitation of each and every factor" is not required, *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013), merely citing a factor without further explanation does not allow the court to follow the ALJ's reasoning. For example, the ALJ's conclusion that "Dr. Burch's assertion of extreme limitations with regard to maintaining attention, concentration and pace is not consistent with the record as a whole" (AR 22), fails to acknowledge the consulting opinions to which the ALJ accorded great weight. Dr.

---

[4] *But see Moody v. Berryhill*, 2017 WL 3215353, at \*10 (N.D. Cal. July 28, 2017) ("Plaintiff having a composed and 'normal' demeanor during doctor visits does not preclude her from experiencing anxiety and depression in other contexts.").

Anderson, who also found that Plaintiff displayed chronic poor concentration and that his condition was worsening.

As a psychiatrist with the VA, Dr. Burch is a mental health specialist who had access to extensive treatment records documenting Plaintiff's visits with numerous VA mental health professionals who treated his PTSD, MST, anxiety, panic attacks, and depression from September 2010 through 2016.[5] His opinion was consistent with the VA's seventy percent disability rating and the opinion of Mr. Cole, who treated Plaintiff from June 2012 to January 2014. Although Mr. Cole is not a medically acceptable source within the meaning of the SSA, he had an extensive treating relationship with Plaintiff and documented Plaintiff's PTSD and depression over time. Initially optimistic regarding Plaintiff's potential for improvement, by 2014 Mr. Cole had concluded that "[Plaintiff's] prognosis for significant improvement [was] poor." (AR 1269.) Similarly, after five months of treating Plaintiff, Dr. Burch opined that "[Plaintiff's] sobriety from cannabis would have little impact on his ability to work" because Plaintiff had "reported . . . periods of time when he has not used cannabis and yet still reported significant PTSD symptoms and mental health issues which would likely make it impossible for him to work and hold a job." (AR 1781.) Dr. Burch therefore concluded that Plaintiff "is permanently and totally disabled." *Id.* The ALJ failed to credit Dr. Burch's status as a specialist and the extensive information he relied on in rendering his opinion.

Finally, in according Dr. Burch's opinion little weight, the ALJ relied on an unsupported speculation that Dr. Burch was biased in favor of his patient. *See Marie K. v. Berryhill*, 2018 WL 3827142, at *15 (D. Vt. Aug. 10, 2018) (reversing in part because the ALJ's "conclusion that [the treating physician's] opinions were entitled to no weight may have been colored by . . . ascribing an improper motive to [the treating physician]

---

[5] The ALJ noted that Dr. Burch had only treated Plaintiff for a portion of his alleged period of disability, however, the record indicates that Plaintiff did not have a choice of VA providers and his care was transferred between providers, sometimes against his wishes.

based on pure speculation."). It is not clear to what extent this improper speculation informed the ALJ's opinion.

Because the ALJ failed to provide "good reasons" for not assigning Dr. Burch's opinions controlling weight, a remand is required. *See Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJ[]s that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); *see also Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) ("[B]ecause . . . the ALJ . . . failed to follow SSA regulations requiring a statement of valid reasons for not crediting the opinion of plaintiff's treating physician . . . a remand is necessary in order to allow the ALJ to reweigh the evidence.").

### D.      Whether the ALJ's Determination that Plaintiff's Substance Abuse Was Material to His Disability Finding Was Supported by Substantial Evidence.

Plaintiff asserts that ALJ Levin erred in finding that substance abuse was material to his disability finding. Specifically, Plaintiff argues that the ALJ improperly "cherry-picked" from Dr. Anderson's opinion, failed to acknowledge Dr. Burch's opinion that ceasing use of cannabis would have little impact on Plaintiff's ability to work, did not credit Plaintiff's report that marijuana addressed his anxiety, and erred in concluding that, without marijuana, Plaintiff's anxiety would not be sufficiently severe to support a finding of disability.

The SSA states: "An individual shall not be considered to be disabled . . . if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C); *see also* 20 C.F.R. § 404.1535(a) (noting an ALJ "must determine whether [] drug addiction or alcoholism is a contributing factor material to the determination of disability.").

The ALJ's observations regarding the impact of Plaintiff's substance abuse included the following:

Medical expert psychiatrist Dr. Anderson asserted that there is no true period of abstinence from polysubstance abuse documented in the medical record. However, he also noted that the record does show an increase in social isolation over time.

Therefore the undersigned finds that even in the absence of polysubstance abuse the record does establish that the [Plaintiff] would continue to have a "severe" impairment or combination of impairments within the meaning of the Social Security Act.

. . .

If the [Plaintiff] stopped the substance use, the remaining limitations would not meet or medically equal the criteria of listings 12.04 or 12.06.

In terms of the "paragraph B" criteria, the [Plaintiff] would have *mild* restriction in activities of daily living if the substance abuse was stopped. This finding is consistent with testimony by medical expert psychiatrist Dr. Anderson. It is also consistent with evidence that in December 2015, the [Plaintiff] admitted to Licensed Social Worker Rossi that he was caring for a new puppy and that in his spare time, he enjoyed playing poker on a computer . . . .

In social functioning, the [Plaintiff] would have *moderate* difficulties if the substance use was stopped. This finding is also consistent with testimony by medical expert Dr. Anderson. He noted that the [Plaintiff] has interacted appropriately with his treatment providers even in the absence of documentation that he has had a true period of sobriety.

With regard to concentration, persistence or pace, the [Plaintiff] would have *moderate* difficulties if the substance use stopped. This finding is consistent with the testimony of medical expert psychiatrist Dr. Anderson. It is also consistent with evidence that in March 2016, Dr. Shiner described the [Plaintiff] as having done well on his cognitive assessment . . . .

As for episodes of decompensation, the [Plaintiff] would experience *no episodes* of decompensation if the substance use was stopped. This finding is also consistent with testimony by Dr. Anderson.

Because [] the remaining limitations would not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensations the "paragraph B" criteria would not be satisfied if the [Plaintiff] stopped the substance use.

(AR 19-20.)

ALJ Levin determined that Plaintiff could work if he abstained from marijuana use. Because a remand is warranted on the ground that the ALJ failed to provide good reasons for according Dr. Burch's opinion less than controlling weight, whether Plaintiff's substance abuse is a contributing factor material to the determination of a disability which depends in part on Dr. Burch's opinion must also be remanded.

As a separate ground for remand, Plaintiff testified he used marijuana to address his panic attacks, anxiety, and other PTSD-related symptoms and the ALJ failed to acknowledge this medicinal use. Although standing alone such an assertion may be insufficient, in this case, at least two physicians, Dr. Isenberg and Dr. Anderson,[6] acknowledged marijuana's potential efficacy for this purpose while cautioning that it increased social isolation. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (holding an ALJ "cannot arbitrarily substitute his own judgment for competent medical opinion") (internal quotation marks omitted). Dr. Anderson further opined that cannabis could reduce hypervigilance, hyperarousal, and anxiety. There is thus at least some evidence in the record that Plaintiff's substance abuse reduced some of his more severe mental health symptoms. Moreover, no medical expert opined that Plaintiff would not have had a nine-day psychiatric hospitalization in the absence of substance abuse. The ALJ's conclusion that Plaintiff "would have *no episodes* of decompensation if the substance use was stopped" (AR 20) is thus pure speculation.

Plaintiff had the burden to establish that his substance abuse was not material. *See Cage v. Comm'r Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012) ("[C]laimants bear the burden of proving [drug addiction or alcoholism's] immateriality[.]"). He satisfied that burden through the opinion of his treating physician that abstinence from marijuana would have limited impact on his ability to work. On remand, the ALJ must reconsider whether substantial evidence supports a substance abuse materiality determination. *Smith v. Comm'r of Soc. Sec.*, 2011 WL 6372792, at *9 (D. Vt. Dec. 20, 2011) (remanding

---

[6] Dr. Anderson opined that it would be "difficult to say" "what [Plaintiff's] limitations would be in terms of social functioning if Plaintiff were not abusing marijuana" because he did not have enough information regarding periods of sobriety from which he could extrapolate. (AR 45-46.)

because "[t]he failure to evaluate the medical evidence . . . and the failure to explain the apparent rejection of medical opinions . . . w[ere] legal error[s which] prevent[ed] the Court from ascertaining whether substantial evidence supported the ALJ's decision").[7]

## CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiff's motion to reverse (Doc. 9) and DENIES the Commissioner's motion to affirm. (Doc. 11.) The court REMANDS this case for a reconsideration of Dr. Burch's treating physician opinion and reconsideration of the materiality of Plaintiff's substance abuse on his ability to work. SO ORDERED.

Dated at Burlington, in the District of Vermont, this _15th_ day of July, 2019.

Christina Reiss, District Judge
United States District Court

---

[7] Plaintiff's final argument is that "[s]ubstantial evidence does not support the findings pertaining to the Listings and RFC analyses given the previous three arguments and the evidence as a whole in the context of the Commissioner having the burden of proof." (Doc. 9 at 10.) This argument consists of a single sentence and the court declines to address it. *See Jimmo v. Sebelius*, 2011 WL 5104355, at *22 n.13 (D. Vt. Oct. 25, 2011).